# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

RENEE DEVON GRAYER,            :

      Plaintiff,                 :

vs.                          :      CA 13-0292-C

CAROLYN W. COLVIN,         :
Acting Commissioner of Social Security,
                               :

      Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Doc. 18 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings."); *see also* Doc. 19 (order of reference).) Upon consideration of the administrative record, plaintiff's brief, the Commissioner's brief, and the arguments of the parties at the February 19, 2014 hearing before the Court, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

---

[1] Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Doc. 18 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for
(Continued)

Plaintiff alleges disability due to degenerative joint disease of the C-spine, arthralgias/myalgias, lumbar spine osteoarthritis, obesity, carpal tunnel syndrome on the right, somatoform disorder, and major depressive disorder rule out bipolar. The Administrative Law Judge (ALJ) made the following relevant findings:

> **1.     The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.**
>
> **2.     The claimant has not engaged in substantial gainful activity since March 1, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**
>
> .     .     .
>
> **3.     The claimant has the following severe impairments: cervical degenerative disc disease, arthralgias/myalgias, lumbar spine osteoarthritis, obesity, right arm carpal tunnel syndrome, somatoform disorder, and major depressive disorder rule out bipolar (20 CFR 404.1520(c) and 416.920(c)).**
>
> .     .     .
>
> **4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**
>
> .     .     .
>
> The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.07. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of

---

this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restriction. When the claimant initially filed her application for disability benefits, she completed a function report wherein she indicated that in an average day she would walk her kids to school, clean the house, feed the dog, cook, and walk to the store. She reported that she was the primary caregiver for her kids, a dog, and an elderly woman who she assisted with daily living activities. She reported that her ability to take care of her own personal bathing and grooming was limited by pain. She reported she left her house every day and that she shopped in stores for food and clothes. She reported that she was able to pay bills, count change, and handle a savings account. She reported that she enjoyed watching television and listening to music. She testified at the hearing that she is still the primary caregiver for her three children, but that she no longer helps the elderly woman. She testified that she walks to her cousin's house occasionally, but that her stepmother assists her with cooking and cleaning. She testified that her children (ages 11, 10, and 8) are now more independent, but that her son has severe medical issues. The undersigned has given great weight to the State agency consultant, Lee Blackmon, M.D., who suggested that the claimant has mild limitation in this area.

In social functioning, the claimant has moderate difficulties. The claimant indicated in the function report that she had difficulty getting along with others, but that she spent time with others "all the time." She reported that she left the house to go to the store and to church. She reported that she was able to leave the house alone. She reported that she had been fired from a job because of difficulties getting along with others. She reported no difficulties getting along with her family members or the elderly lady she cared for. She testified that she currently lives in a house with her father, her stepmother, and her three children. She testified that she spends time with her kids, and visits her cousin on a weekly basis. She no longer attends church because she moved. She testified that she has anger issues and is paranoid that other people are talking about her. Dr. Gammill observed in November of 2010 that the claimant was fully oriented, that her communication ability was within normal limits, that her voice quality was normal, and that her articulation was normal. The undersigned has given great weight to Dr. Blackmon, who suggested that the claimant has moderate limitation in this area.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant indicated in the function report that she was able to perform concentration[-]intensive tasks such as watching television, preparing meals, counting change, and handling a savings account. She reported she was able to pay attention "until I don't want to hear it." She reported that she was "okay" at following written and spoken instructions, but that she had difficulty finishing tasks. She

testified that she is still able to prepare a simple meal and that she watches television and reads the newspaper. Dr. Gammill observed in November of 2010 that the claimant was fully oriented, that her immediate and long term memory were intact, and that her attention and concentration abilities were normal. The undersigned has given great weight to Dr. Blackmon, who suggested that the claimant has moderate limitation in this area.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation[] which have been of extended duration. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may also be inferred from medical records showing significant alteration in medication, documentation of the need for a more structured psychological support system, or other relevant information in the record about the existence, severity, and duration of the episode. In this case, the evidence fails to show that the claimant has experienced any extended episodes of deterioration or decompensation. This is consistent with the finding made by Dr. Blackmon.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

.     .     .

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments. Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental functional analysis.

**5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of "light work" as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant can lift and carry up to 10 pounds frequently and 20 pounds occasionally. She can sit up to six hours in an eight-hour workday, and stand and walk up to four hours each during an eight-hour workday. She is frequently able to use her upper and lower extremities for pushing and pulling. She is frequently able to bend, balance, stoop, kneel, crouch, crawl and climb ramps and stairs. She is precluded from climbing ladders, ropes, and scaffolds. She can**

**frequently reach, handle, finger, and feel. She is precluded from exposure to extreme heat and cold, vibrations, unprotected heights, and dangerous machinery. She can perform simple routine tasks involving simple, short instructions and simple work related decisions with few workplace changes. She can occasionally interact with the public, co-workers, and supervisors. She can sustain concentration and attention for two-hour periods.**

.      .       .

The claimant engages in activities of daily living that are inconsistent with her allegation of total disability. When she initially filed her application for disability, she reported that in an average day she would walk her kids to school, clean the house, feed the dog, cook, and walk to the store. She reported that she was the primary caregiver for her kids, a dog, and an elderly woman who she assisted with daily living activities. She reported that she left her house every day and that she shopped in stores for food and clothes. She reported that she was able to pay bills, count change, and handle a savings account. She reported that she enjoyed watching television and listening to music. She reported that she spent time with others "all the time." She testified at the hearing that she is still the primary caregiver for her three children, but that she no longer helps the elderly woman. She testified that she walks to her cousin's house occasionally, but that her stepmother assists her with cooking and cleaning. She testified that her children (ages 11, 10, and 8) are now more independent, but that her son has severe medical issues. She testified that she spends a lot of time with her kids and she visits her cousin on a weekly basis. She occasionally walks to her cousin's house.

Although the claimant filed her application for disability in May of 2009, she did not seek treatment for her alleged physical impairments until December of 2009. Her entire treatment history consists of four emergency room visits and four visits to Dr. Gammill. She has not received any treatment for her physical impairments since November of 2010. She testified that her doctor refuses to see her, but there is no evidence of her seeking out a new doctor or seeking treatment from the emergency room. Dr. Ellis observed during his consultative examination that the claimant had an essentially normal examination and that she was able to send a text message during his evaluation, despite her allegation of hand pain and numbness. Dr. Gammill has observed[,] on multiple occasions, that the claimant appears well developed and nourished and that she is in no acute distress. He has observed that her neck has no masses or tenderness, and that her upper and lower extremities have full range of motion, normal stability, normal strength, normal reflexes, normal tone, normal sensation, no tenderness, no crepitation, no edema, no atrophy, and no pain on motion. He has observed that her spine has full range of motion, normal strength and tone, and no tenderness, scoliosis, or subluxation. He has observed that she has a normal gait, that she has a normal heel-to-toe walk, that she is able to stand without difficulty, and that she is able to

participate in an exercise program. Dr. Gammill has treated the claimant conservatively with prescription pain medications. He has not recommended surgery or referred her to any specialists for her physical impairments.

The claimant underwent a consultative examination performed by Sam R. Banner, M.D. on March 15, 2011. Dr. Banner observed that the claimant's cervical spine was without tenderness, deformity, or spasm, but that her range of motion was slightly reduced. He observed that she had a negative Tinel's sign and normal reflexes in her upper extremities. He observed that she was able to oppose her fingers to her thumbs in a normal manner and that her fine and gross manipulation were normal. He observed that she had 20 kilograms of grip strength on the right and 18 kilograms on the left. He observed that she had normal range of motion in her upper extremities (including her hands/fingers) except for decreased shoulder abduction and forward elevation. He observed that seated straight leg raising caused bilateral calf pain and that her dorsolumbar spine range of motion was reduced, but he also noted that visual examination of her lumbar spine was unremarkable and that her sensation and reflexes were intact. He observed that she had pain getting on and off the exam table and that she performed a minimal squat, but he also observed that her gait and station were normal and that she was able to heel to toe walk. He observed that she had full range of motion in her lower extremities except for decreased hip and knee flexion. He emphasized that the claimant gave poor effort during the physical examination. He noted that her x-rays revealed a normal lumbar spine and mild cervical degenerative disc disease.

Following his consultative examination, Dr. Banner submitted a medical source statement suggesting that the claimant can lift a maximum of 10 pounds on an occasional basis, that she can sit a maximum of two hours at a time and six hours in an eight hour workday, that she can stand a maximum of 15 minutes at a time and one hour in an eight hour workday, and that she can walk a maximum of 15 minutes at a time and 30 minutes in an eight hour workday. He suggested that she can only occasionally reach, handle, finger, feel, operate foot controls, climb ramps and stairs, balance, stoop, kneel, and crouch. He suggested that she can never climb ladders or scaffolds or crawl. He suggested that she can handle only occasional exposure to moving mechanical parts, motor vehicle operation, humidity and wetness, and pulmonary irritants, and that she should avoid unprotected heights, temperature extremes, and vibrations. This statement has been given little weight because it appears to be based on the claimant's reported medical history and subjective complaints as opposed to objective medical evidence. The statement is inconsistent with Dr. Banner's narrative report[,] including the normal exam findings and the poor effort by the claimant. It is also inconsistent with the other evidence discussed above[,] including the claimant's lack of treatment, the normal exam findings of Dr. Gammill, and the claimant's activities of daily living.

The undersigned has considered the claimant's obesity under the guidelines mandated by Social Security Ruling 02-1p and as indicated in Appendix 1, Subpart P, Regulations No. 4 under "Listings" 1.00(F). None of the treating or examining physicians have indicated any specific limitations of function in connection with the claimant's obesity and she has not specifically alleged any functional limitations as a result of this condition. The undersigned finds that the claimant's obesity, considered individually and in combination with her other impairments, does not cause any additional and significant limitations of function that are not reflected in the residual functional capacity set forth in finding five.

The claimant did not begin receiving psychiatric treatment until September of 2010, and she did not see a psychiatric specialist until January of 2011. Dr. Jordan observed during his November 2009 consultative examination that the claimant was neatly groomed, that her hygiene was good, that she had no unusual gestures, that her speech was normal, and that her affect was stable. He observed that she was able to do reverse serial 7s and spell "gold" backwards to demonstrate intact concentration abilities. He observed that the claimant's short and long term memory were intact, but that her fund of information was below average and her abstractions were somewhat concrete. He observed that her thought process was normal and that she was free of delusions, hallucinations, and suicidal ideations. He observed that her judgment and insight were somewhat impaired, but that her daily living skills were not impacted by intellectual function. Dr. Jordan diagnosed the claimant with somatization disorder. Dr. Gammill diagnosed the claimant with depression and bipolar based on her subjective complaints but he consistently observed that she was fully oriented, that her mood was normal, that her affect was appropriate, that her speech and communication abilities were normal, that her fund of knowledge was normal, that her short and long term memory were intact, and that her attention and concentration abilities were normal. The claimant began receiving counseling from therapists at South Central Alabama Mental Health in January of 2011, but there is no evidence that she has ever been evaluated by a psychiatrist. The therapy records reflect that the claimant made progress towards her treatment goals, but she was discharged in March of 2011 because she moved out of the service area. She returned in June of 2011, but it was noted that "her lawyer reminded her of continual mental health treatment, and she is trying to get SSD." The claimant has never been hospitalized for her psychological impairments.

The undersigned has given little weight to the opinions from the claimant's treating therapists. Throughout the claimant's treatment at South Central Alabama Mental Health, she was assigned global assessment of functioning (GAF) scores in the 40s indicating severe functional impairment. In addition, on July 11, 2011, the clinical direct[or] submitted an evaluation form suggesting that the claimant is moderately limited in her daily activities; her ability to get along with coworkers and

peers; her ability to understand, remember, and carry out simple instructions; and her ability to respond appropriately to supervision. The director also suggested that the claimant is markedly impaired in her ability to understand, remember, and carry out complex and repetitive tasks; maintain attention and concentration for extended periods; perform activities within a schedule and maintain regular attendance; sustain a routine without special supervision; respond appropriately to changes in the work setting; and respond to customary work pressures. This opinion is inconsistent with the longitudinal record[,] including the claimant's activities of daily living, her lack of mental health treatment, the consultative examination from Dr. Jordan, and the treatment notes from Dr. Gammill. In addition, the opinion is not from an acceptable medical source.

The undersigned has given some weight to the opinion provided by Dr. Jordan in conjunction with his consultative examination. Dr. Jordan suggested that the claimant can function independently, that she can carry out and remember simple one-step instructions, that she can do multi-step instructions with some degree of supervision, and that she is only mildly impaired in her ability to respond to coworkers, supervisors, and everyday work pressures. This opinion is largely consistent with Dr. Jordan's consultative examination and the remainder of the longitudinal record.

The undersigned has also given some weight to the State agency consultant, Dr. Blackmon. Dr. Blackmon suggested that the claimant can learn and remember simple work routines, carry out simple instructions, sustain attention to simple tasks for extended periods, and handle ordinary work pressures. He suggested [claimant] would benefit from a flexible work schedule and would be expected to miss 1-2 days a month due to worry. He suggested that the claimant would benefit from casual supervision, that she would function best with her own work station apart from others, and that she would benefit from regular rest breaks. He suggested that her contact with the public should be casual and that feedback and criticism should be supportive and non[-]confrontational. He suggested that she would argue with co-workers once a month, which would be mildly distracting to others. He suggested that she could adapt to infrequent changes, but that she would need help with long term planning and goal setting. This opinion is somewhat consistent with the record; however, any suggestion that the claimant would have excessive absenteeism or that she is unable to tolerate customary work pressures, occasional workplace changes, and occasional contact with others is inconsistent with the claimant's activities of daily living, her lack of mental health treatment, and the exam results from Dr. Jordan and Dr. Gammill.

In sum, based on a review of the medical evidence of record, as well as the claimant's testimony at the hearing, the undersigned finds that the evidence does not support the claimant's allegations of totally

incapacitating physical and mental symptomatology. The record fails to document persistent, reliable manifestations of a disabling loss of functional capacity by the claimant resulting from her reported symptomatology. After considering the entirety of the record, the undersigned concludes that the claimant is capable of performing a range of light work consistent with what is set forth above in finding five.

**6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

.      .      .

**7.      The claimant was born on October 8, 1976 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).**

**8.      The claimant has a marginal education (7th Grade) and is able to communicate in English (20 CFR 404.1564 and 416.964).**

**9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).**

.      .      .

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.18. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as clothes bagger (DOT Code 920.687-018, light, unskilled) with approximately 87,000 jobs in the National economy and 1,500 in Alabama; assembler (DOT Code 712.687-010, light, unskilled) with approximately 150,000 jobs in the National economy and 1,200 in Alabama; cloth examiner (DOT Code 689.687-022, light, unskilled) with approximately

250,000 jobs in the National economy and 2,000 in Alabama; and inspector packer (DOT Code 559.687-074, light, unskilled) with approximately 400,000 jobs in the National economy and 9,000 in Alabama. Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11.     The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

(Tr. 25, 26, 27-28, 29, 30-34, 34 & 35 (internal citations and footnotes omitted; emphasis in original).)  The Appeals Council affirmed the ALJ's decision (Tr. 1-3) and thus, the hearing decision became the final decision of the Commissioner of Social Security.

## DISCUSSION

In all Social Security cases, the claimant bears the burden of proving that she is unable to perform her previous work.  *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors:  (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history.  *Id.* at 1005. Once the claimant meets this burden, as here, it becomes the Commissioner's burden to prove that the claimant is capable, given her age, education and work history, of engaging in another kind of substantial gainful employment, which exists in the national economy.  *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that she can perform those light jobs

identified by the vocational expert, is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[2] Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 Fed. Appx. 995, 996 (11th Cir. Apr. 1, 2010) (per curiam)[3] (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). And, "'[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence.'" *Id.* (quoting *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1158-1159 (11th Cir. 2004)).

On appeal to this Court, Grayer asserts three—arguably related—reasons why the Commissioner's decision to deny her benefits is in error (*i.e.*, not supported by substantial evidence): (1) the ALJ failed to consider the medical opinion of Mr. William Wright, plaintiff's treating licensed clinical social worker; (2) the ALJ substituted her opinion for that of Dr. Sam Banner; and (3) the ALJ's determination that she is capable of performing light work is not supported by substantial evidence. The

---

[2]     This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

[3]     "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

Court will address the first issue alone and then combine the other two issues for discussion.

      **A.    <u>Opinion of William Wright, a Licensed Clinical Social Worker.</u>** Grayer initially contends that the ALJ failed to consider the medical opinion of her "treating" licensed clinical social worker, Mr. William Wright. (Doc. 14, at 6-11.) There can be no question but that the clinical director at South Central Alabama Mental Health, William Wright, a licensed clinical social worker, completed a mental residual functional capacity evaluation form on July 11, 2011, and thereon indicated—of particular note— that Grayer has the following marked limitations: (1) in her ability to understand, remember and carry out complex instructions and repetitive tasks; (2) in her ability to maintain attention and concentration for extended periods; (3) in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) in her ability to sustain a routine without special supervision; (5) in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) in her ability to make simple work-related decisions; and (7) in her ability to respond appropriately to changes in the work setting and to customary work pressures. (Tr. 390.) Interestingly, however, Wright's assessment is not accompanied by a narrative report (*see* Tr. 389 ("***In addition to the information provided in your narrative report,* please complete items 1 through 20 below by circling the appropriate word.**" (emphasis supplied))) and there is absolutely no evidence in the record that Wright was plaintiff's "treating" licensed clinical social worker, as suggested by Grayer in her brief (*compare* Doc. 14, at 6 (referencing Wright as the treating licensed clinical social worker) *with* Tr. 379-388 (records from South Central

Alabama Mental Health reflecting Aiko Obuchi as Grayer's primary therapist and making no reference to Wright)).

Therapists and licensed clinical social workers are excluded from the list of "acceptable medical sources" whose opinions are to be considered in determining the existence of an impairment. *See* 20 C.F.R. §§ 404.1513(a) & 416.913(a) (2013). However, medical sources who are not "acceptable medical sources" are considered "other sources" and their opinions and evidence may be used "to show the severity" of an impairment and "how it affects [the] ability to work[.]" *See* 20 C.F.R. §§ 404.1513(d) & 416.913(d).

Social Security Ruling 06-03p clearly provides that the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d) can be applied to opinion evidence from medical sources who are not "acceptable medical sources," including the following factors: (1) how long the source has known the claimant and how frequently the source has seen the claimant; (2) how consistent the source's opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support the opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairments; and (6) any other factors that tend to support or refute the source's opinion. *Id*. The ruling goes on to explain that not every factor listed will apply in every case. *Id*. And, finally, the ruling explains that the "adjudicator generally should explain the weight given to opinions from [] 'other sources,' or otherwise ensure that the discussion of the evidence in the . . . decision allows a . . . subsequent reviewer to follow the adjudicator's reasoning . . . ." *Id*.

With these principles in mind, the undersigned considers plaintiff's initial argument that the "ALJ failed to consider the medical opinion of Mr. William Wright, Ms. Grayer's treating licensed clinical social worker." (Doc. 14, at 6.) The plaintiff is

correct in noting that the regulations provide that "[r]egardless of its source, . . . every medical opinion" received is to be evaluated, *see* 20 C.F.R. §§ 404.1527(c) and 416.927(c); however, any suggestion by plaintiff that the ALJ did not consider Wright's opinion or state the weight afforded that opinion (Doc. 14, at 6-7) is simply incorrect inasmuch as the ALJ referenced Wright's assessment—including the numerous "marked" limitations set forth thereon—and stated she was affording that opinion "little weight[.]" (*See* Tr. 32-33.)[4] There were several reasons identified by the ALJ for giving Wright's opinion little weight, including that the opinion was inconsistent with Dr. Jordan's consultative examination and Dr. Gammill's treatment notes. (Tr. 33; *see id.* ("This opinion is inconsistent with the longitudinal record including the claimant's activities of daily living, her lack of mental health treatment, the consultative examination from Dr. Jordan, and the treatment notes from Dr. Gammill.").) And while it is true that the ALJ did not elaborate upon what she meant in this portion of her decision, she committed no error inasmuch as in discussing the evidence in other portions of her decision she ensured that this Court could follow her reasoning in this regard. *See* SSR 06-03p ("[T]he adjudicator generally should explain the weight given to opinions from [] 'other sources,' or otherwise ensure that the discussion of the evidence in the . . . decision allows a . . . subsequent reviewer to follow the adjudicator's reasoning . . . ."). The ALJ correctly summarized Dr. Jordan's consultative examination findings (Tr. 32 ("Dr. Jordan observed during his November 2009 consultative examination that the claimant

---

[4] Moreover, as previously noted, plaintiff's suggestion that Wright was her "treating" licensed clinical social worker is also incorrect as Wright's only connection with plaintiff is his completion of the mental RFC assessment on July 11, 2011. (*See* Tr. 389-391.) In other words, nothing in the records received from South Central Alabama Mental Health indicate that Wright ever saw plaintiff or otherwise "treated" her mental impairment(s). (*See* Tr. 379-388.)

was neatly groomed, that her hygiene was good, that she had no unusual gestures, that her speech was normal, and that her affect was stable. He observed that she was able to do reverse serial 7s and spell 'gold' backwards to demonstrate intact concentration abilities. He observed that the claimant's short and long term memory were intact, but that her fund of information was below average and her abstractions were somewhat concrete. He observed that her thought process was normal and that she was free of delusions, hallucinations, and suicidal ideations. He observed that her judgment and insight were somewhat impaired, but that her daily living skills were not impacted by intellectual function. Dr. Jordan diagnosed the claimant with somatization disorder."); *compare id. with* Tr. 262)) and opinion regarding plaintiff's mental residual functional capacity (Tr. 33 ("Dr. Jordan suggested that the claimant can function independently, that she can carry out and remember simple one-step instructions, that she can do multi-step instructions with some degree of supervision, and that she is only mildly impaired in her ability to respond to coworkers, supervisors, and everyday work pressures."); *compare id. with* Tr. 263), as well as Dr. Gammill's treatment notes (Tr. 32 ("Dr. Gammill diagnosed the claimant with depression and bipolar based on her subjective complaints but he consistently observed that she was fully oriented, that her mood was normal, that her affect was appropriate, that her speech and communication abilities were normal, that her fund of knowledge was normal, that her short and long term memory were intact, and that her attention and concentration abilities were normal."); *compare id. with* Tr. 337-343 & 345-363 (Dr. Gammill's treatment notes also reflect that plaintiff's judgment and insight were intact and that her rate of thoughts were normal, thought content logical, abstract reasoning was within normal limits, and that computation was intact for basic mathematical constructs including addition and subtraction)). This evidence, produced by two doctors who actually examined the

plaintiff, stands in stark contrast to the "marked" (and other) limitations found by a licensed clinical social worker that never "examined" or provided therapy to plaintiff and did not provide any explanation for his opinion or evidentiary support for it.[5] *See* SSR 06-03p (list of factors applicable when considering opinions from "other sources" such as licensed clinical social workers and therapists). Thus, the ALJ did not err in affording Wright's RFC opinion "little" weight.

      B.     **Dr. Sam Banner's Physical RFC Opinion and the ALJ's RFC Opinion that Plaintiff is Capable of Performing a Range of Light Work**. The undersigned combines plaintiff's other two issues for discussion inasmuch as they are intertwined, plaintiff contending, on the one hand, that the ALJ substituted her RFC opinion for that of Dr. Banner (*see* Doc. 14, at 11 & 13-16) and, on the other, that the ALJ's RFC determination is not supported by substantial evidence since the only physical RFC assessment in the record—the one from Dr. Banner—contradicts the ALJ's RFC assessment (*see id*. at 16-20).

      Initially, the Court simply **REJECTS** any suggestion by the plaintiff that the ALJ substituted her RFC opinion for that of Dr. Banner because in making this argument plaintiff conflates the nature of residual functional capacity with the responsibility for making the residual functional capacity determination, a responsibility which decidedly rests with the ALJ. *Compare* 20 C.F.R. §§ 404.1546(c) & 416.946(c) ("If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is

---

[5]     The objective findings contained in the therapist's notes from South Central Mental Health do not support either the GAF scores indicated by the therapist—40 or 42 (Tr. 380, 383 & 386)—or the "marked" (or other) limitations found by Wright. (*See* Tr. 379, 382 & 385 (noting no orientation deficits, appropriate grooming, reported hallucinations on only one occasion but otherwise thoughts and perceptional disturbances within normal limits, a fair appetite, an appropriate affect, and either a dysphoric—depressed—or euthymic—positive—mood).)

responsible for assessing your residual functional capacity.") *with, e.g., Packer v. Commissioner, Social Security Admin.*, --- Fed. Appx. ----, 2013 WL 5788574, at *1 (11th Cir. Oct. 29, 2013) (per curiam) ("An RFC determination is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments. There is no rigid requirement that the ALJ specifically refer to every piece of evidence, so long as the ALJ's decision is not a broad rejection, i.e., where the ALJ does not provide enough reasoning for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole." (internal citation omitted)). Moreover, no "substitution" occurred in this case. Instead, what happened is that the ALJ considered Dr. Banner's RFC opinion and explicitly stated that she was affording that opinion "little weight" for the following reasons: (1) the statement appeared "to be based on the claimant's reported medical history and subjective complaints as opposed to objective medical evidence[;]" (2) the statement was inconsistent with Dr. Banner's own narrative report, including his examination findings and notation that plaintiff gave poor effort; and (3) the statement was inconsistent with other evidence in the record, including "the claimant's lack of treatment, the normal exam findings by Dr. Gammill, and the claimant's activities of daily living." (Tr. 31-32.) The law in the Eleventh Circuit is clear that while "'the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion'" and the ALJ articulates her reasoning for rejecting the subject opinion. *Syrock, supra*, 764 F.2d at 835, quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. Unit B 1981). Since the ALJ correctly applied the law in according "little weight" to Dr. Banner's RFC opinion and the evidence of record—including Dr. Banner's own narrative report and clinical findings (*see* Tr. 364-367), the relatively benign clinical findings of Dr. Gammill (*see* Tr.

337-343 & 345-363) and Dr. Mark Ellis (Tr. 255 & 257-258), and the claimant's reported activities of daily living (*see, e.g.,* Tr. 214-221)—supports the ALJ's decision in this regard, no error was committed.[6] In other words, because the ALJ articulated appropriate reasons for not giving Dr. Banner's RFC opinion "controlling" weight, and because those reasons are supported by substantial evidence, the undersigned need simply turn to the ALJ's RFC determination, to examine whether that assessment is linked to specific evidence in the record regarding the plaintiff's ability to perform the physical, mental, sensory, and other requirements of work. *See, e.g., Salter v. Astrue,* 2012 WL 3817791, *3 (S.D. Ala. Sept. 4, 2012).

A plaintiff's RFC—which "includes physical abilities, such as sitting, standing or walking, and mental abilities, such as the ability to understand, remember and carry out instructions or to respond appropriately to supervision, co-workers and work pressure[]"—"is a[n] [] assessment of what the claimant can do in a work setting despite any mental, physical or environmental limitations caused by the claimant's impairments and related symptoms." *Watkins v. Commissioner of Social Security,* 457 Fed. Appx. 868, 870 n.5 (11th Cir. Feb. 9, 2012) (citing 20 C.F.R. §§ 404.1545(a)-(c), 416.945(a)-(c)); *see also Packer, supra,* 2013 WL 5788574, at *1 ("An RFC determination is an

---

[6]     In addition, the Court reads Dr. Banner's physical medical source statement (*see* Doc. 370-375), as did the ALJ (Tr. 31), to suggest that in filling out the form he relied in large measure on Grayer's subjective complaints inasmuch as Banner makes four different references on the form to plaintiff's "history" (*see* Tr. 370, 372, 373 & 374) and the relevant "history" contained on Dr. Banner's report consists of the following: "Musculoskeletal History: Claimant complains of chronic neck and low back pain and has been diagnosed with degenerative disc disease. She states her pain began approximately one year ago and is progressively getting worse. She receives treatment from Dr. Gamble (Family Practice). She states she has been diagnosed with carpal tunnel in her right wrist. She states she is unable to sit or stand prolonged periods and [it] is painful to raise her arms. She states now she is having pain in both arms and legs. She has received some injections (? hip) in the past but with little relief." (Tr. 364.)

assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments." (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). Here, the ALJ determined Grayer's RFC as follows: "**After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of 'light work' as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant can lift and carry up to 10 pounds frequently and 20 pounds occasionally. She can sit up to six hours in an eight-hour workday, and stand and walk up to four hours each during an eight-hour workday. She is frequently able to use her upper and lower extremities for pushing and pulling. She is frequently able to bend, balance, stoop, kneel, crouch, crawl and climb ramps and stairs. She is precluded from climbing ladders, ropes, and scaffolds. She can frequently reach, handle, finger, and feel. She is precluded from exposure to extreme heat and cold, vibrations, unprotected heights, and dangerous machinery. She can perform simple routine tasks involving simple, short instructions and simple work related decisions with few workplace changes. She can occasionally interact with the public, co-workers, and supervisors. She can sustain concentration and attention for two-hour periods.**" (Tr. 29 (emphasis in original).)

To find that an ALJ's RFC determination is supported by substantial evidence, it must be shown that the ALJ has "'provide[d] a sufficient rationale to link'" substantial record evidence "'to the legal conclusions reached.'" *Ricks v. Astrue*, 2012 WL 1020428, *9 (M.D. Fla. Mar. 27, 2012) (quoting *Russ v. Barnhart*, 363 F. Supp. 2d 1345, 1347 (M.D. Fla. 2005)); *compare id. with Packer v. Astrue*, 2013 WL 593497, *4 (S.D.Ala. Feb. 14, 2013) ("'[T]he ALJ must link the RFC assessment to specific evidence in the record bearing upon the claimant's ability to perform the physical, mental, sensory, and other requirements of work.'" (quoting *Salter*, 2012 WL 3817791, at *3)), *aff'd* --- Fed. Appx. ----

, 2013 WL 5788574 (11th Cir. Oct. 29, 2013)[7]; *see also Hanna v. Astrue*, 395 Fed. Appx. 634, 636 (11th Cir. Sept. 9, 2010) (per curiam) ("The ALJ must state the grounds for his decision with clarity to enable us to conduct meaningful review. . . . Absent such explanation, it is unclear whether substantial evidence supported the ALJ's findings; and the decision does not provide a meaningful basis upon which we can review [a plaintiff's] case." (internal citation omitted)).[8]

First, contrary to Grayer's suggestion (*see* Doc. 14, at 19), in order to find the ALJ's RFC assessment supported by substantial evidence, it is not necessary for the ALJ's assessment to be supported by the assessment of an examining or treating physician. *See, e.g., Packer, supra,* 2013 WL 593497, at *3 ("[N]umerous court have upheld ALJs' RFC determinations notwithstanding the absence of an assessment performed by an examining or treating physician."); *McMillian v. Astrue*, 2012 WL 1565624, *4 n.5 (S.D.

---

[7]    In affirming the ALJ, the Eleventh Circuit rejected Packer's substantial evidence argument, noting, she "failed to establish that her RFC assessment was not supported by substantial evidence[]" in light of the ALJ's consideration of her credibility and the medical evidence. *Id.* at *2.

[8]    It is the ALJ's (or, in some cases, the Appeals Council's) responsibility, not the responsibility of the Commissioner's counsel on appeal to this Court, to "state with clarity" the grounds for an RFC determination. Stated differently, "linkage" may not be manufactured speculatively by the Commissioner—using "the record as a whole"—on appeal, but rather, must be clearly set forth in the Commissioner's decision. *See, e.g., Durham v. Astrue,* 2010 WL 3825617, *3 (M.D. Ala. Sept. 24, 2010) (rejecting the Commissioner's request to affirm an ALJ's decision because, according to the Commissioner, overall, the decision was "adequately explained and supported by substantial evidence in the record"; holding that affirming that decision would require that the court "ignor[e] what the law requires of the ALJ[; t]he court 'must reverse [the ALJ's decision] when the ALJ has failed to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted'" (quoting *Hanna,* 395 Fed. App'x at 636 (internal quotation marks omitted))); *see also id.* at *3 n.4 ("In his brief, the Commissioner sets forth the evidence on which the ALJ **could have** relied . . . . There may very well be ample reason, supported by the record, for [the ALJ's ultimate conclusion]. However, because the ALJ did not state his reasons, the court cannot evaluate them for substantial evidentiary support. Here, the court does not hold that the ALJ's ultimate conclusion is unsupportable on the present record; the court holds only that the ALJ did not conduct the analysis that the law requires him to conduct." (emphasis in original)); *Patterson v. Bowen,* 839 F.2d 221, 225 n.1 (4th Cir. 1988) ("We must . . . affirm the ALJ's decision only upon the reasons he gave.").

Ala. May 1, 2012) (noting that decisions of this Court "in which a matter is remanded to the Commissioner because the ALJ's RFC determination was not supported by substantial and tangible evidence still accurately reflect the view of this Court, but not to the extent that such decisions are interpreted to require that substantial and tangible evidence must—in all cases—include an RFC or PCE from a physician" (internal punctuation altered and citation omitted)); *but cf. Coleman v. Barnhart,* 264 F.Supp.2d 1007 (S.D. Ala. 2003).

Importantly, in establishing Grayer's RFC, which means determining Grayer's "remaining ability to do work despite her impairments[,]" *Packer*, 2013 WL 5788574, at *1—keeping a focus on the extent of those impairments as documented by the credible record evidence—the ALJ walked through the scant evidence documenting Grayer's various pain complaints from October 2009 through November 2010, along with her consultative disability examination by Dr. Banner on March 15, 2011 (*see* Tr. 30-32), to ultimately conclude—based on "the entirety of the record"—that Grayer was "capable of performing a range of light work consistent with what is set forth above in finding five." (Tr. 34.) As alluded to earlier, the evidence of record supporting the "physical" portion of the ALJ's RFC determination—as set forth by the ALJ (*see* Tr. 30-32)—includes Dr. Banner's own narrative report and clinical findings (*see* Tr. 364-367), the relatively benign clinical findings of Dr. Gammill (*see* Tr. 337-343 & 345-363) and Dr. Mark Ellis (Tr. 255 & 257-258), and the claimant's reported activities of daily living (*see, e.g.,* Tr. 214-221).

The ALJ's analysis shows to this Court that she considered Grayer's medical condition as a whole in determining plaintiff's RFC. Accordingly, the ALJ's RFC determination provides an articulated linkage to the medical evidence of record. The linkage requirement is simply another way to say that, in order for this Court to find

that an RFC determination is supported by substantial evidence, ALJs must "show their work" or, said somewhat differently, show *how* they applied and analyzed the evidence to determine a plaintiff's RFC. *See, e.g., Hanna*, 395 Fed. Appx. at 636 (an ALJ's "decision [must] provide a meaningful basis upon which we can review [a plaintiff's] case"); *Ricks*, 2012 WL 1020428, at *9 (an ALJ must "explain the basis for his decision"); *Packer*, 2013 WL 5788574, at *1 (an ALJ [must] provide *enough reasoning* for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole[]" (emphasis added)). Thus, by "showing her work" (*see* Tr. 30-34), the ALJ has provided the required "linkage" between the record evidence and her RFC determination necessary to facilitate this Court's meaningful review of her decision.

Because substantial evidence of record supports the Commissioner's determination that Grayer can perform the physical and mental requirements of less than the full range of light,[9] and plaintiff makes no argument that this residual functional capacity would preclude her performance of the jobs identified by the vocational expert ("VE") during the administrative hearing, the Commissioner's fifth-step determination is due to be affirmed. *See, e.g., Owens v. Commissioner of Social Security*, 508 Fed.Appx. 881, 883 (11th Cir. Jan. 28, 2013) ("The final step asks whether there are significant numbers of jobs in the national economy that the claimant can perform, given h[er] RFC, age, education, and work experience. The Commissioner bears the burden at step five to show the existence of such jobs . . . [and one] avenue[] by which the ALJ may determine [that] a claimant has the ability to adjust to other work

---

[9]     This Court's analysis of Grayer's RFC argument has focused upon the "physical" portion of the ALJ's RFC determination as that is the portion specifically attacked by plaintiff. (Doc. 14, at 16-20.) The undersigned would parenthetically note that the ALJ also sufficiently "linked" the "mental" portion of her RFC determination to evidence in the record. (*Compare* Tr. 32-33 *with* Tr. 214-220, 261-263, 265-266, 337-343 & 345-362.)

in the national economy . . . [is] by the use of a VE[.]"(internal citations omitted)); *Land v. Commissioner of Social Security,* 494 Fed.Appx. 47, 50 (11th Cir. Oct. 26, 2012) ("At step five . . . 'the burden shifts to the Commissioner to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.' The ALJ may rely solely on the testimony of a VE to meet this burden." (internal citations omitted)).

## CONCLUSION

In light of the foregoing, it is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 5th day of March, 2014.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**